IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL L. BOLDEN, on behalf of himself and those similarly situated.<br><br>Plaintiffs,<br><br>v.<br><br>EAST COAST SALOONS, LLC, and its wholly owned or controlled subsidiaries,<br>205 East 42nd St., STE 202<br>New York, NY 10017<br><br>and<br><br>MIRIAM'S KIDS, INC. d/b/a MCFADDEN'S RESTAURANT AND SALOON<br>416 North 3rd St.<br>Philadelphia, PA 19123<br><br>Defendants. | CIVIL ACTION NO. 10-6121<br><br>**FILED**<br>NOV 10 2010<br>MICHAEL E. KUNZ, Clerk<br>By_____ Dep. Clerk<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

I.  **INTRODUCTION**

Plaintiff, Michael L. Bolden, currently works full-time as an attorney with Community Legal Services, a non-profit organization dedicated to providing legal aid to the underprivileged. Plaintiff also works part-time as a bartender at Defendant, Miriam's Kids, Inc. d/b/a McFadden's Restaurant and Saloon in Philadelphia (hereinafter, "McFadden's Philadelphia"), one of twenty-four restaurants and bars owned and operated by Defendant, East Coast Saloon, LLC. Plaintiff brings this action on behalf of

himself, and those similarly situated, against East Coast Saloons, LLC, and its wholly owned or controlled subsidiaries (hereinafter, "East Coast Saloons"), including McFadden's Philadelphia for violations of the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981, *et seq.* ("Section 1981"). Plaintiff also brings this case for violations of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000(a), *et seq.* ("Title II") for injunctive relief.

This case is about a national chain of restaurants and bars that discriminates against non-white employees, applicants for employment and customers on the basis of race and skin color. Defendants systematically and intentionally foster an environment at its locations where non-whites are subjected to inferior treatment and denial of service. As described in more detail below, East Coast Saloons endorses a culture throughout its network of establishments where racism and racial segregation are not only tolerated, but mandated.

By way of example, on October 28, 2010, the General Manager of McFadden's Philadelphia explicitly declared by text message to a shift supervisor: **"We don't want black people we are a white bar!"** Defendants' plan for the future is clear. As the GM exclaimed via text message to the same shift manager on October 29, 2010: "Let's get back to basics and make the necessary changes by fading away **that clientele from the bar and behind the bar.**"

II. **PARTIES**

1. Plaintiff, Michael L. Bolden ("Plaintiff"), is an individual and citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, PA.

2. Plaintiff is non-white.

3. Defendant, East Coast Saloons, LLC, and its wholly owned or controlled subsidiaries ("East Coast Saloons") is a New York corporation with its principal place of business located at 205 East 42nd St., Suite 202, New York, NY 10017.

4. Defendant, Miriam's Kids, Inc. d/b/a McFadden's Restaurant and Saloon ("McFadden's Philadelphia") is a Pennsylvania corporation with its principal place of business located at 416 3rd Street Philadelphia, PA.

5. At all times material hereto, East Coast Saloons owned and/or operated McFadden's Philadelphia as well as twenty-three (23) other bars and restaurants throughout the United States.

6. At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees, acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

7. At all times material hereto, Defendants acted as an employer within the meanings of the statutes which form the basis of this matter.

8. At all times material hereto, Plaintiff was an employee of Defendants within the meanings of the statutes which form the basis of this matter.

III. **JURISDICTION AND VENUE**

9. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

10. The causes of action set forth in this Complaint arise under the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981, *et seq.* ("Section 1981") and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000(a), *et seq.* ("Title II").

11. This Court has federal question jurisdiction over all claims pursuant to 28 U.S.C. 1331 and 1343(a).

12. Venue is proper in this district under 28 U.S.C. §1391(b)(c) because the events giving rise to the claims occurred within this district, Plaintiff is employed within this district, and Defendants transact business and are found in this district.

IV. **CLASS ALLEGATIONS**

13. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

14. Plaintiff brings this Complaint pursuant to Federal Rules of Civil Procedure 23, on behalf of the following class: All persons who are non-white, and who were, are, or will be employed by Defendants in the United States of America from November 10, 2006, through the final disposition of this Action and all persons who are non-white, and who have applied for, but have been denied employment by Defendants in the United States of America from November 10, 2008, through the final disposition of this Action (hereinafter "the Class").

15. The Class is so numerous that joinder of all members is impractical. Plaintiff estimates that the Class consists of well in excess of a thousand (1000) present and former non-white employees of Defendants and non-white applicants who have been denied employment by Defendants. Given the large number of Class members and their geographical dispersion, it is impracticable for all Class members to join in the individual litigation.

16. There are questions of law and of fact common to the Class, including but not limited to:

a) whether Defendants' common operating policies, procedures and practices, including with regard to hiring, work assignments, promotion, compensation and termination, have a disparate impact on non-white employees and whether this disparate impact is justified by any business necessity;

b) whether Defendants' common operating policies, procedures and practices which result in the disparate treatment of non-white employees violate Section 1981;

c) whether Defendants have engaged in a pattern and practice of intentional disparate treatment of its non-white employees in violation of Section 1981; and,

d) whether Plaintiff and the Class are entitled to the relief prayed for in this Complaint.

17. Plaintiff is a member of the Class and the claims of Plaintiff are typical of the claims of the Class.

18. Plaintiff will fairly and adequately protect the interest of the members of the Class. Plaintiff has no interests that are antagonistic to other members of the Class. Additionally, Plaintiff has retained counsel who are competent and experienced in the prosecution of employment and complex class action litigation. Plaintiff will vigorously prosecute this case on behalf of the Class.

19. Class certification is appropriate under Rules 23(b)(2) because Defendants have acted or refused to act in a manner generally applicable to the Class, thereby making appropriate declaratory relief and/or final injunctive relief and other equitable relief on a Class-wide basis to end Defendants' discriminatory policies,

procedures and practices.

20. Class certification also would be appropriate under Rule 23(b)(3). The common issues of law and fact presented in this Complaint predominate over any individual issues. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy, because joinder of all members is impracticable. Defendants' personnel policies, procedures and practices are uniform and discriminatory. The expense and burden of individual litigation makes it impractical for the members of the Class to pursue individual litigation to vindicate their rights.

21. Plaintiff is not aware of any problems that would militate against the maintenance of this action as a class action.

V. **FACTUAL ALLEGATIONS**

22. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

### Plaintiff Michael L. Bolden

23. Plaintiff is an employee of Defendants. He is twenty-nine (29) years old and was raised in Philadelphia, Pennsylvania.

24. Plaintiff's father is African-American, and his mother is Cuban-American, of Spanish descent. In 2003, Plaintiff graduated from Stanford University with an undergraduate degree in Political Science.

25. In 2009, Plaintiff graduated from the James E. Beasley School of Law at Temple University (hereinafter, "Temple Law School"), in Philadelphia. He successfully passed the Pennsylvania and New Jersey Bar Examinations shortly thereafter.

26. Currently, Plaintiff works full-time as a staff attorney at Community Legal

Services, a non-profit legal aid organization in Philadelphia, where he specializes in landlord and tenant disputes.

27. From June 2007 through the present, Plaintiff has also maintained part-time employment with McFadden's Philadelphia in various capacities described in more detail below.

### Defendant East Coast Saloons

28. East Coast Saloons is the parent company of several restaurants and bars throughout the United States. Its corporate headquarters are located at 205 E. 42nd St., Suite 202, New York, NY 10017.

29. At all times material hereto, the President of East Coast Saloons was John L. Sullivan.

30. Mr. Sullivan is white.

31. East Coast Saloons owns and operates approximately twenty-four (24) large-scale sports bars and nightclubs nationwide that provide entertainment and serve food and beverages to the public.

32. The locations owned or operated by East Coast Saloons include, but are limited to:

- Burke's Bar – 645 Bronx River Road, Yonkers, NY 10704
- Calico Jack's Glendale – 6770 N. Sunrise Blvd., Glendale, AZ 85305
- Calico Jack's NYC – 42 St. at 2nd Avenue, New York, NY 10017
- Calico Jack's Pittsburgh - 353 North Shore Drive, Pittsburgh, PA 15212
- Irish Exit – 978 2nd Avenue, New York, NY 10022
- Maker's Lounge – 446 S. 4th St., Louisville, KY 40202
- McFadden's Ballpark – 1 Citizens Bank Way, Philadelphia, PA 19148
- McFadden's Ballpark NY – 36-2 126th St., Flushing, NY 11368
- McFadden's Boston – 148 State St., Boston, MA 02109
- McFadden's Chicago -1206 N. State Parkway, Chicago, IL 60610

- McFadden's Columbus – 1576 N. High St., Columbus, OH 43201
- McFadden's D.C. – 2401 Pennsylvania Ave., Washington D.C. 20037
- McFadden's Glendale – 9425 West Coyotes Blvd., Glendale, AZ 85305
- McFadden's Nashville – 132 2nd Ave., Nashville, TN 37201
- McFadden's NYC – 800 2nd Ave., New York, NY 10017
- McFadden's Philadelphia – 461 N. 3rd St., Philadelphia PA 19123
- McFadden's Pittsburgh – 211 N. Shore Dr., Pittsburgh, PA 15212
- McFadden's Rockville Centre – 210 Merrick Rd., Rockville Centre, NY 11570
- McFadden's Vegas – 3700 W. Flamingo Rd., Las Vegas NV 89103
- M.J. Armstrong's – 329 1st Ave., New York, NY 10003
- Sign of the Whale – 1825 M St., NW, Washington D.C. 20036
- Sully's Saloon, 434 S. 4th St., Louisville, KY 40202
- Tavern on Broad, 200 S. Broad St., Philadelphia, PA 19102
- Turtle Bay, 987 2nd Ave., New York, NY 10022

33. At all times material hereto, Harry Hayman was a Vice President and part-owner of East Coast Saloons.

34. Mr. Hayman is white.

35. Mr. Hayman's office is currently located at McFadden's Philadelphia.

36. At all times material hereto, Mr. Hayman was a direct supervisor to the General Managers of McFadden's Philadelphia and McFadden's Ballpark (in Philadelphia).

37. In the past four years, Mr. Hayman has also supervised many other locations owned or operated by East Coast Saloons throughout the country.

### Defendant McFadden's Philadelphia

38. McFadden's Philadelphia is a bar and restaurant located in the Old City area of Philadelphia, Pennsylvania.

39. At all times material hereto, McFadden's Philadelphia has employed approximately seventy-five (75) individuals at any given time in various capacities,

including bartenders, wait staff, and "Goodwill Ambassadors," commonly referred to as the security staff.

40. McFadden's Philadelphia promotes and markets itself as a casual restaurant and sports bar that transitions into a nightclub on most nights.

41. A substantial portion of the general crowd at McFadden's Philadelphia is comprised of college-aged students and recent college graduates.

42. Most customers and employees of McFadden's Philadelphia are white.

43. Currently, of the approximately seventy-five (75) people employed by McFadden's only five (5) are black, including the man and woman who work in bathrooms handing out towels.

### McFadden's Philadelphia's Bar Areas

44. McFadden's Philadelphia features three separate and distinct "bar areas." Individual bartenders are assigned to one bar area per shift and must remain behind or near the assigned bar for the duration of the shift. The three bar areas in McFadden's Philadelphia are named:

- Main Bar – located at the entrance of the building;
- Lucky Lounge – located at the back of the building; and,
- Jameson Room – located in the downstairs portion of the building.

45. The Main Bar attracts the biggest crowd and features the largest television sets.

46. Bartenders who are assigned to the Main Bar usually earn the most money in tips.

47. Shifts at the Main Bar are considered the most prestigious at McFadden's Philadelphia.

### McFadden's Philadelphia's Parking Lots

48. Patrons of McFadden's Philadelphia have access to two parking lots: one lot is adjacent to the building and the other is across the street.

49. During the day, these parking lots are used by office workers who are not affiliated with McFadden's Philadelphia.

50. After 5:00 p.m., McFadden's Philadelphia has control over the parking lots and has the ability to open or close the lots at its discretion.

51. In general, these parking lots are open for use by McFadden's Philadelphia patrons every night.

### McFadden's Philadelphia Dress Code

52. McFadden's Philadelphia mandates a dress code on its website and on a large, conspicuous sign by the entrance of the building.

53. The McFadden's Philadelphia Dress Code reads:

*Attire: STRICTLY ENFORCED:*

- *No Hats or Head Coverings of Any Kind*
- *No Athletic Wear or Jerseys*
- *No Work Boots of Any Color*
- *No "Manpris"*
- *No Hooded Sweatshirts or Sweatsuits (Men and Women)*
- *No Excessively Baggy Clothing or Oversized Logos*
- *No Sleeveless Shirts*
- *All Chains or Pendants must be Tucked In*
- *No Plain White Tees*

*McFadden's reserves the right to refuse service to anyone.*

54. McFadden's Philadelphia retains the right by written policy to deny access, at their discretion, to anyone who is wearing baggy pants, a plain white t-shirt, and/or boots.

55. Upon information and belief, the McFadden's Philadelphia Dress Code is used to disproportionally exclude a larger percentage of non-white potential patrons, than white patrons.

### McFadden's Philadelphia Management

56. The highest ranking position at McFadden's Philadelphia is General Manager.

57. The General Manager of McFadden's Philadelphia in 2007, when Plaintiff was hired, was Jason Lawrence.

58. Mr. Lawrence is white.

59. Mr. Lawrence was replaced in 2008 by Walt Wyrsta, who is the current General Manager of McFadden's Philadelphia.

60. Mr. Wyrsta is white.

61. Mr. Wyrsta has worked at McFadden's for approximately seven (7) years.

62. Mr. Wyrsta was promoted to General Manager of the bar approximately two (2) years ago and has remained in this position since.

63. Currently, all employees at McFadden's Philadelphia report to Mr. Wyrsta.

64. Mr. Wyrsta reports directly to Harry Hayman.

65. Mr. Hayman's office is currently located a few doors down from Mr. Wyrsta's office in the Philadelphia McFadden's.

66. At all times material hereto, a shift supervisor, referred to as a "Night Manager," is assigned to manage a specific night of the week at McFadden's Philadelphia.

67. At all times material hereto, Kathryn Killian was the Wednesday Night Manager.

68. Ms. Killian is white.

69. Ms. Killian reports to Robert Brazas, Assistant General Manager, and Mr. Wyrsta.

70. Mr. Brazas is white.

71. Ms. Killian has been employed by McFadden's Philadelphia for over approximately three (3) years, and has worked in the capacity of Night Manager for approximately two (2) years.

### Plaintiff's Employment History at McFadden's Philadelphia

72. In June 2007, Plaintiff began working at McFadden's Philadelphia.

73. Plaintiff was hired by Jason Lawrence, then-General Manger of McFadden's Philadelphia. Plaintiff and Mr. Lawrence were acquaintances before Mr. Lawrence hired Plaintiff.

74. Mr. Lawrence is white.

75. In 2008, Mr. Lawrence was transferred to another East Coast Saloons restaurant in Washington, D.C.

76. Plaintiff's first position at McFadden's Philadelphia was a member of the "Goodwill Ambassador" staff, or security team. He reported directly to Jim Stains, head of security at McFadden's Philadelphia.

77. Mr. Stains is white.

78. Prior to his first day of employment on the security staff at McFadden's Philadelphia, Plaintiff expressed to Mr. Lawrence and other employees his desire to work as a bartender.

79. As of in or around June 2007, McFadden's Philadelphia employed only **one** black bartender.

80. Moreover, the female workers employed as "Lucky Charms," who were women who served "shots" of alcohol on the bar floor, were all white women. Conversely, in or around June 2007, almost the entire security team at McFadden's Philadelphia was comprised of black men.

81. Upon information and belief, in general, most non-managers of McFadden's Philadelphia, excluding a few members of the security staff who were security specialists, seek to be promoted to bartender.

82. Specifically, the prized position at McFadden's Philadelphia is that of Main Bar bartender on Friday and Saturday nights.

83. In or around September 2008, Plaintiff was given the opportunity to "guest bartend" at McFadden's Philadelphia.

84. Mr. Lawrence, who was still the GM of the bar, made the decision to have Plaintiff guest bartend.

85. McFadden's web site describes the "guest" positions as an opportunity to earn a permanent job as a bartender or "beer tub girl," which are women who distribute beverages from locations on the bar floor rather than from behind the bar.

86. Plaintiff made several guest bartending appearances, and they were viewed as a success by McFadden's Philadelphia.

87. Shortly after his guest bartending appearances, Plaintiff was promoted to permanent bartender status.

88. At the time Plaintiff was promoted to permanent bartender, he was the **only** permanent black bartender at McFadden's Philadelphia.

89. Plaintiff continued to work as a bartender and occasional Minister of Hospitalities, which is akin to "bar host," at McFadden's Philadelphia for the duration of 2009, with a brief hiatus in the summer of 2009 after he graduated from Temple Law School and was studying for the bar examination.

90. By Spring 2010, Plaintiff was one of the most senior bartenders at McFadden's Philadelphia.

91. During this time, Plaintiff generally worked two (2) nights per week, almost always including Friday and Saturday nights. On the majority of nights, he worked at the Main Bar as a bartender. Occasionally, he worked at the back bar, or "Lucky Lounge," and he rarely worked at the downstairs bar, or "Jameson Room."

### Wednesday Nights in Summer 2010

92. Every summer, business at McFadden's Philadelphia decreases because the local college students who form a large portion of the bar's base tend to leave the area for summer break and the white weekend patrons go to the Jersey Shore.

93. In the Summer of 2010, McFadden's Philadelphia sought to generate business during the week by ramping up special event nights and promotions.

### Kathryn Killian Hires a New Promoter and DJ, Both Are Black.

94. In or around June 2010, Ms. Killian, Wednesday Night Manager at McFadden's Philadelphia, hired a promoter named Alexis and a reputable DJ (DJ

Hollywood) to headline Wednesday nights in an effort to bring in more customers. Both Alexis and DJ Hollywood are black.

95. Ms. Killian's efforts were a resounding success as McFadden's Philadelphia became a very popular Wednesday night scene.

96. Approximately 900 to 1000 customers came to McFadden's Philadelphia every Wednesday night in June and July 2010. These numbers were usually only ever reached on Friday and Saturday nights, which are typically the most popular nights for the bar. These numbers are hardly ever reached during any night of the week in the Summer.

97. Upon information and belief, McFadden's Philadelphia garnered more revenue on these Wednesday nights than they did on weekend nights in the Summer, and far eclipsed the amount earned on other weekday nights.

98. Plaintiff, who typically only worked on Friday and Saturday nights, was asked to work on Wednesday nights as well because the nights were so popular.

99. On the Wednesday nights in June and July 2010, the crowd at the bar mostly comprised of non-white patrons, unlike any other night of the week at McFadden's Philadelphia.

100. The different demographic can be attributed to the large following of the promoter and DJ hired by Ms. Killian.

## McFadden's Philadelphia Decides to End
## Summer Wednesdays to Get Rid of the Black Clientele

101. By the middle of August, McFadden's Philadelphia's "usual crowd" of white college-aged students and recent graduates began to return to the Philadelphia area from summer break and weekends at the Jersey Shore.

102. McFadden's management decided that the Wednesday nights that amassed a majority non-white crowd would have to be dismantled by the time the "usual crowd" of white individuals returned so they would once again flood the bar.

103. Defendants took bold and deliberate steps to convey an unequivocal message to its Wednesday night patrons: Non-whites are no longer welcome at McFadden's Philadelphia.

104. Toward the end of the summer of 2010, Defendants terminated the black promoter and DJ even though they had garnered unprecedented revenues for the bar.

105. Toward the end of the summer of 2010, Defendants closed off access to the parking lots adjacent to the bar just on Wednesday nights, to make it more difficult for non-white patrons to access the bar, even though this had never been done on any other night.

106. On two consecutive Wednesday nights in mid-August (August 11, 2010 and August 18, 2010), Defendants shut down public access to McFadden's Philadelphia.

107. Defendants' decisions to terminate its relationship with DJ Hollywood and the black promoter, close off its parking lots on Wednesday nights, and shut down the entire bar on two consecutive Wednesday nights coincided directly with the end of

summer break and the "shore season," which took many of McFadden's Philadelphia "usual" white patrons away from the area for the summer.

### In August 2010, Plaintiff is Relegated to the Back Bar

108. By the spring 2010, Plaintiff was one of the most senior bartenders at McFadden's Philadelphia. Accordingly, he was often chosen to work the "prized" periods of Friday and Saturday nights at the Main Bar.

109. From April 30, 2010 until August 7, 2010, Plaintiff worked twenty-three (23) shifts at McFadden's Philadelphia. Of those twenty-three (23) shifts, he worked the Main Bar twenty (20) times.

110. Starting in the end of August 2010, Plaintiff was stripped of his coveted Main Bar position and relegated to the back bar, or "Lucky Lounge."

111. Plaintiff was never given any indication that his performance as a bartender had diminished or any explanation for why he was taken off his normal duties as Main Bar bartender. Rather, he remained one of the most senior bartenders at the establishment.

112. From August 21, 2010 until November 6, 2010, Plaintiff was only given ten (10) shifts at McFadden's Philadelphia. Of those ten (10) shifts, he was assigned to the back bar eight (8) times and was given the Main Bar only twice.

113. Meanwhile, less qualified and less experienced white bartenders were assigned the Main Bar and, during this time period, other than the two times Plaintiff tended the Main Bar, no black bartenders were assigned the Main Bar.

## October 28th and 29th Text Messages And Emails
## from Mr. Wyrsta to Ms. Killian

114. Ms. Killian remains the Wednesday Night Manager at McFadden's Philadelphia, and it is her duty to generate business on her nights.

115. After Mr. Wyrsta told Ms. Killian to stop using the black promoter, Alexis, and the black DJ, DJ Hollywood, Ms. Killian began advertising guest bartending positions on Craigslist.com, an online network of free advertisements. She also received recommendations regarding potential guest bartenders from Mr. Brazas.

116. On Thursday, October 28, 2010, Mr. Wyrsta, G.M. of McFadden's Philadelphia, communicated with his subordinate, Ms. Killian, on several occasions by text message.

117. Mr. Wyrsta sent the texts to Ms. Killian to inquire about the racial demographic of the patrons and guest bartenders hired by McFadden's Philadelphia the previous evening. Ms. Killian told Mr. Wyrsta that she hired two black guest bartenders for a "battle of the bartenders" special promotional event which took place on that night.

118. Specifically, the conversation via text message between Mr. Wyrsta and Ms. Killian reads:[1]

> From: Walt Wyrsta[2]
> To: Kathy Killian
> Received: Oct 28, 2010 6:43 PM
> Subject: What was the demo last night?
>
> What was the demo ["demographic"] last night?

---

[1] The entirety of the text message and email conversations between Mr. Wyrsta and Ms. Killian are attached hereto and incorporated here in as Exhibits A and B.

[2] For ease of reading, the "From" and "To" lines have been modified to list the names of who sent and received each message.